**THIRD DIVISION**
**DOYLE, P. J.,**
**REESE, J., and SENIOR APPELLATE JUDGE PHIPPS**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

June 22, 2022

# In the Court of Appeals of Georgia

A22A0068. ARBOR MANAGEMENT SERVICES, LLC v. HENDRIX et al.

DOYLE, Presiding Judge.

Carlos Hendrix, Cedric Hendrix, and Meliton Barron sued Arbor Management Services, LLC ("AMS"), seeking damages based on the death of Catherine Hendrix, who died on April 6, 2020, from COVID-19 while she was a resident at a senior citizens' residential facility allegedly managed by AMS.[1] AMS now appeals from the denial of its motion to dismiss, contending that the trial court erred by ruling that (1) it is not immune from suit under the federal Public Readiness and Emergency Preparedness Act[2] ("PREP Act"); and (2) it is not immune under the Georgia COVID-

---

[1] Additional defendants related to Arbor were also named, but they were dismissed without prejudice.

[2] 42 USC § 247d-6d.

19 Pandemic Business Safety Act[3] ("GCPBSA"). For the reasons that follow, we conclude that the plaintiffs' claims, as amended, are barred by the GCPBSA, and we reverse.

The record shows that the plaintiffs filed this action in April 2020. According to the complaint, as amended, in 2017, Hendrix moved into Arbor Terrace at Cascade, a senior-citizen residential facility managed by AMS. On March 11, 2020, due to the emerging COVID-19 pandemic in the United States, Arbor Terrace announced that it would implement restrictions on outside visitation and contact among residents, effective at noon on March 12, 2020. The complaint further alleges that after March 12, Arbor Terrace failed to enforce the restriction on outside visitation, failed to ensure that staff wore masks or other personal protective equipment, and allowed asymptomatic staff who had been exposed to the SARS-CoV-2 virus to continue to work.

According to the complaint, Arbor Terrace did not enforce social distancing among residents until on or after March 17. On March 17, Arbor Terrace hosted a St. Patrick's Day social event among the residents in the common area, but it did not require social distancing. The same day, Arbor Terrace also provided a scenic bus

---

[3] OCGA § 51-16-1 et seq.

ride with other residents who were not socially distanced. Hendrix attended the gathering and the bus ride.

On March 26, Hendrix was taken to Grady Memorial Hospital with a fever. On March 27, Hendrix tested positive for COVID-19, and she was put on a ventilator the next day. On April 6, ten days after testing positive, Hendrix died from complications due to COVID-19. By that time, Arbor Terrace had become aware that 29 residents had tested positive for the COVID-19 virus.

The plaintiffs sued AMS in the State Court of Fulton County, alleging claims for negligence and gross negligence and seeking damages for wrongful death as well as punitive damages. The defendants answered and later filed a notice of removal to federal court, arguing that any state law claims were preempted by the PREP Act.[4] Following briefing by the parties, the federal court held that it lacked original jurisdiction because the PREP Act did not function as a total preemption of state law claims. Accordingly, it remanded the case back to the Georgia state court. That order was not appealed.

---

[4] As discussed below, the PREP Act establishes immunity for certain covered persons (and an exclusive federal remedy) for certain claims arising from "the administration to or the use by an individual of a covered countermeasure." 42 USC § 247d-6d (a)(1), 247d-6e. "Covered countermeasure" is defined as certain pandemic products, drugs, and devices. See 42 USC § 247d-6d (i) (1).

3

On remand to the state court and following discovery, AMS moved for judgment on the pleadings, arguing that it was immune under the PREP Act, the PREP Act was the exclusive remedy and the state court was not the proper tribunal, and it was immune from ordinary negligence claims under the Georgia Emergency Management Act[5] ("GEMA") and GCPBSA. The plaintiffs opposed the motion and amended their complaint to refine their claim for gross negligence, asserting "a want of even slight care and diligence" on the part of AMS.

Fifteen days after the plaintiffs filed their amended complaint, the state court entered an order denying AMS's motion for judgment on the pleadings.[6] The court held that the plaintiffs' amended complaint pleaded claims for gross negligence that, if proven, would fall outside the immunities set out in GEMA and GCPBSA. The court also held that the allegations of the complaint fell outside the scope of the PREP Act, so their claims were not barred by that act.

---

[5] OCGA § 38-3-1 et seq.

[6] The parties had stipulated that AMS would have until April 9, 2021, to respond to the amended complaint. The state court entered its order on the amended complaint on April 6, 2021. A second stipulation was filed by the parties, extending the response time to April 16, 2021.

One week after the trial court entered that order, AMS moved to dismiss the amended complaint. AMS argued that the amended complaint's allegations of gross negligence were conclusory attempts to bolster what are essentially ordinary negligence claims, that the claims implicated professional negligence requiring an expert affidavit under OCGA § 9-11-9.1, and that the claims were barred under the PREP Act.

The plaintiffs opposed the motion, and the state court denied the motion to dismiss, essentially reciting the same conclusions in its earlier order: the complaint adequately pleaded gross negligence, the action was not predicated on professional negligence requiring an expert affidavit under OCGA § 9-11-9.1, and the action did not fall within the scope of the PREP Act's exclusive remedy and immunity provisions. AMS now appeals.

1. *Effect of the PREP Act*. AMS contends that the state court erred by concluding that the PREP Act's exclusive remedy and immunity provisions do not preempt or bar the state law claims brought in the amended complaint. We disagree.

"On appeal of a trial court's ruling on a motion to dismiss, our review is de novo. However, we construe the pleadings in the light most favorable to the plaintiff with any doubts resolved in the plaintiff's favor."[7]

A variety of courts have addressed the application of the PREP Act, passed in 2005, in cases arising following a COVID-19 death. The Fifth Circuit Court of Appeals recently provided a useful summary in the context of claims based on the COVID-19 pandemic response:

> The Act contains a broad grant of immunity from any suit for losses caused by, arising out of, relating to, or resulting from the administration to or the use by an individual of a covered countermeasure. [A "covered countermeasure" is defined as a pandemic product, drug, or other device.[8]] Thus, there must be a causal relationship between an injury and the administration to or use by an individual of a covered countermeasure. These protections only apply, however, if the Secretary of the Department of Health and Human Services ["Department of HHS"] makes a declaration through the Federal Register, identifies a current or impending public health emergency, identifies covered countermeasures, states that the immunity provision is in effect, and meets other statutory requirements in the declaration. Courts lack

---

[7] (Citation and punctuation omitted.) *Handberry v. Stuckey Timberland, Inc.*, 345 Ga. App. 191 (812 SE2d 547) (2018).

[8] 42 USC § 247d-6d (i).

6

jurisdiction to review any action by the Secretary in making a declaration. Likewise, declarations preempt state law.

For most who suffer an injury that falls under the immunity provision, the sole remedy is compensation from the "Covered Countermeasures Process Fund," as determined by an administrative process. This is likewise an exclusive remedy. There is an exception for "death or serious physical injury proximately caused by willful misconduct." The United States District Court for the District of Columbia has exclusive jurisdiction to adjudicate these willful-misconduct claims. Generally, claimants must first exhaust the administrative remedies discussed above before going to court.

The Act defines willful misconduct as "an act or omission that is taken intentionally to achieve a wrongful purpose; knowingly without legal or factual justification; and in disregard of a known or obvious risk that is so great as to make it highly probable that the harm will outweigh the benefit." The Act also provides that the definition of willful misconduct "shall be construed as establishing a standard for liability that is more stringent than a standard of negligence in any form or recklessness."

In sum, once the Secretary promulgates a declaration, most injuries caused by a covered person administering a covered countermeasure are subject to the sole remedy of a compensation fund. There is a narrow exception for willful-misconduct claims, which proceed under an exclusive federal cause of action in the United States

District Court for the District of Columbia, but only after the claimant has exhausted administrative remedies.[9]

With respect to preemption, the PREP Act includes the following language:

During the effective period of a declaration [of a public health emergency] or at any time with respect to conduct undertaken in accordance with such declaration, no State or political subdivision of a State may establish, enforce, or continue in effect *with respect to a covered countermeasure* any provision of law or legal requirement that —

(A) is different from, or is in conflict with, any requirement applicable under this section; and

(B) relates to the design, development, clinical testing or investigation, formulation, manufacture, distribution, sale, donation, purchase, marketing, promotion, packaging, labeling, licensing, use, any other aspect of safety or efficacy, or the prescribing, dispensing, or administration by qualified persons of the covered countermeasure, or to any matter included in a requirement applicable to the covered countermeasure under this section or any other provision of this Act [42 USCS §§ 201 et seq.], or under the Federal Food, Drug, and Cosmetic Act [21 USCS §§ 301 et seq.].[10]

---

[9] (Citations and punctuation omitted.) *Mitchell v. Advanced HCS, LLC*, 28 F4th 580, 586 (II) (A) (5th Cir. Mar. 10, 2022).

[10] (Emphasis supplied.) 42 USC § 247d-6d (b) (8).

Finally, we note that

the purpose of Congress is the ultimate touchstone in every preemption case. Second, in all preemption cases, and particularly in those in which Congress has legislated in a field which the States have traditionally occupied, we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.[11]

---

[11] (Citations and punctuation omitted.) *Wyeth v. Levine*, 555 U. S. 555, 565 (II) (129 SCt 1187, 173 LEd2d 51) (2009). To the extent that AMS relies on advisory opinions issued by HHS addressing preemption,

[t]he Secretary's or General Counsel's interpretation of the preemptive effect of the PREP Act is not binding on this Court. Indeed, [certain] Advisory Opinion[s] explicitly state[] that [they do] "not have the force or effect of law." Further, HHS is not delegated authority under the PREP Act to interpret the scope of federal courts' jurisdiction. Therefore, the Advisory Opinion is not entitled to deference from this Court.

(Citations and punctuation omitted.) *Estate of Lindsay v. Gulf Shore Facility, Inc.*, No. 8:21-cv-1238-WFJ-JSS at *10-11 (2021 U.S. Dist. LEXIS 240556) (MD Fla. Dec. 16, 2021) (punctuation omitted), citing *Christensen v. Harris County*, 529 U. S. 576, 587 (120 SCt 1655, 146 LEd 2d 621) (2000) (explaining that "an interpretation contained in an opinion letter," as opposed to the result of "a formal adjudication or notice-and-comment rulemaking," does "not warrant *Chevron*-style deference" because it "lack[s] the force of law"). See generally *Tibbles v. Teachers Retirement Sys. of Ga.*, 297 Ga. 557, 563 (2) (b) (775 SE2d 527) (2015) ("[A]dministrative implementation of a particular statutory provision qualifies for *Chevron* deference when it appears that Congress delegated authority to the agency generally to make

9

Here, it is clear from the above statutory language that in relation to both preemption and immunity, the PREP Act operates with respect to "covered countermeasures." But the plaintiffs' claims are not predicated on the use or even non-use of a "covered countermeasure." As noted above, the PREP Act defines that term to include certain objects, devices, and drugs. Consistent with this, the Secretary of HHS issued declarations that, for example, "provided immunity for covered persons for the use of covered measures, including 'any antiviral, any other drug, any biologic, any diagnostic, any other device, or any vaccine, used to treat, diagnose, cure, prevent, or mitigate COVID-19.'"[12]

In contrast to this, the plaintiffs' amended complaint alleges that it failed to adequately restrict visitation to the facility, it allowed staff to work without personal protective equipment until March 25, 2020, it failed to implement social distancing until after March 17, 2020, it allowed asymptomatic staff who had been exposed to

---

rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority."); *Chevron USA, Inc. v. Natural Resources Defense Council, Inc.*, 467 U. S. 837, 843-845 (104 SCt 2778, 81 LE2d 694) (1984) (a reviewing court must defer to an agency's interpretation of statute within its expertise so long as it is reasonable).

[12] *Saldana v. Glenhaven Healthcare LLC*, 27 F4th 679, 687 (III) (B) (2) (9th Cir. Feb. 22, 2022).

COVID-19 to continue to work, it hosted a St. Patrick's Day social gathering, and it arranged a scenic ride in which residents were not socially distanced from one another.

As demonstrated by these allegations, the allegedly wrongful conduct is based on decisions made by AMS regarding visitation, staffing, recreation, and socialization — conduct that has nothing to do with administration of a "covered countermeasure" such as a drug, device, or other object as identified by HHS. For the PREP Act's preemption or immunity to apply, "there must be a 'causal relationship' between an injury and the administration to or use by an individual of a covered countermeasure."[13] Accordingly, as the trial court ruled, this action falls outside the scope of the PREP Act's immunity provisions or preemptive effect.[14]

---

[13]*Mitchell*, 28 F4th at 586 (II) (A), quoting 42 USC § 247d-6d (a) (2) (B) ("The immunity under paragraph (1) applies to any claim for loss that has a causal relationship with the administration to or use by an individual of a covered countermeasure, including a causal relationship with the design, development, clinical testing or investigation, manufacture, labeling, distribution, formulation, packaging, marketing, promotion, sale, purchase, donation, dispensing, prescribing, administration, licensing, or use of such countermeasure."). See also 42 USC § 247d-6d (b) (8) ("[N]o State or political subdivision of a State may establish, enforce, or continue in effect *with respect to a covered countermeasure* any provision of law or legal requirement that" conflicts with the PREP Act.) (emphasis supplied).

[14] This conclusion is consistent with the overwhelming majority of decisions by federal courts that have decided that the PREP Act does not establish complete

11

2. *Effect of the Georgia COVID-19 Pandemic Business Safety Act*. AMS also contends that the trial court erred by denying their motions for judgment on the pleadings and to dismiss based on state-law immunities applicable to the COVID-19 pandemic. These immunities apply except in cases of gross negligence or similar extreme conduct. Because the amended complaint fails to allege such conduct, we conclude that the trial court erred.

On appeal, we review de novo the trial court's decision on a motion for judgment on the pleadings to determine whether the undisputed facts appearing from the pleadings entitle the movant to judgment as a matter of law. The grant of a motion for judgment on the pleadings under OCGA § 9-11-12 (c) is proper only where there is a complete failure to state a cause of action. . . . For purposes of the motion, all well-pleaded material allegations by the nonmovant are taken

_____

preemption of all state law claims, and certain state law claims are outside the scope of the PREP Act. See, e.g., *Perez v. Southeast SNF, L.L.C*., Case No. 21-50399 at * 7 (III) (2022 US App LEXIS 8599) (5th Cir. Mar. 31, 2022); *Saldana*, 27 F4th at 688 (III) (B) (9th Cir. Feb. 22, 2022). Cf. *Estate of Maglioli v. Alliance HC Holdings LLC*, 16 F4th 393, 413 (VI) (3d Cir. 2021) (holding that state law negligence claims are not preempted by the PREP Act and that the PREP Act is not an exclusive federal cause of action requiring removal to federal court); *Schleider v. GVDB Operations, LLC*, No. 21-80664-CIV at *8 (2021 U.S. Dist. LEXIS 101976) (SD Fla. May 20, 2021) ("[S]tate-law claims of negligence and wrongful death based on a nursing home's inaction in failing to protect against the spread of COVID-19 . . . are not within the scope of the PREP Act."). See also *Wyeth*, 555 U. S. at 565.

12

as true, and all denials by the movant are taken as false. But the trial court need not adopt a party's legal conclusions based on these facts.

> However, where . . . the part[y] moving for judgment on the pleadings do[es] not introduce affidavits, depositions, or interrogatories in support of [its] motion, such motion is the equivalent of a motion to dismiss the complaint for failure to state a claim upon which relief can be granted. The motion to dismiss should not be granted unless the averments in the complaint disclose with certainty that the plaintiff would not be entitled to relief under any state of facts which could be proved in support of [her] claim.[15]

Further, "[q]uestions of negligence and diligence, even of gross negligence and slight diligence, usually are matters to be determined by the jury, but in plain and indisputable cases the court may solve the question as a matter of law."[16]

On March 14, 2020, pursuant to GEMA, the governor of Georgia issued an executive order declaring a public health emergency stating that all "healthcare facilities" shall comply with emergency orders issued by the governor.[17] On April 14,

---

[15] (Citation and punctuation omitted.) *City of Albany v. GA HY Imports, LLC*, 348 Ga. App. 885, 887 (825 SE2d 385) (2019).

[16] *Wolfe v. Carter*, 314 Ga. App. 854, 859 (2) (b) (726 SE2d 122) (2012).

[17] State of Georgia Executive Order 3.14.20.01.

13

2020, the governor issued another executive order stating that "services provided or performed by healthcare institutions [including nursing homes and assisted living communities] . . . shall be considered emergency management activities pursuant to [OCGA §] 38-3-35."[18] Under OCGA § 38-3-35 (b), emergency management activities that are "reasonably attempting to comply with" emergency orders cannot serve as a basis for liability for death or personal injury "*except in cases of willful misconduct, gross negligence, or bad faith.*"[19]

Similarly, in response to the COVID-19 pandemic, the General Assembly enacted the GCPBSA in August 2020.[20] Under that act:

---

[18] State of Georgia Executive Order 4.14.20.01. See also OCGA § 31-7-1 (4) (A) (defining "institution"). Any question regarding the retroactive application of this law is not properly before this Court because the question was not raised and ruled upon in the trial court. See *Smith v. Baptiste*, 287 Ga. 23, 29 (3) (694 SE2d 83) (2010). The plaintiffs' motion to file a supplemental brief to address this question for the first time on appeal is hereby denied. See *Lowery v. Atlanta Heart Assoc., PC*, 266 Ga. App. 402, 404 (2) (597 SE2d 494) (2004) ("Our appellate courts are courts for the correction of errors of law committed in the trial court. Routinely, this Court refuses to review issues not raised in the trial court. . . . Fairness to the trial court and to the parties demands that legal issues be asserted in the trial court.") (punctuation omitted).

[19] (Emphasis supplied.)

[20] Ga. L. 2020, p. 798, § 3.

14

No healthcare facility, healthcare provider, entity [including nursing homes and assisted living facilities[21]], or individual shall be held liable for damages in an action involving a COVID-19 liability claim against such healthcare facility, healthcare provider, entity, or individual, unless the claimant proves that the actions of the healthcare facility, healthcare provider, entity, or individual showed *gross negligence, willful and wanton misconduct, reckless infliction of harm, or intentional infliction of harm*.[22]

Based on these statutes, AMS contends that the trial court should have dismissed the amended complaint because it does not sufficiently allege conduct amounting to gross negligence or other wanton misconduct outside the scope of immunity from COVID-based claims under Georgia law.

First, we note that we look only to the conduct alleged in the complaint, not the plaintiffs' legal characterization of it as grossly negligent: "we are under no

---

[21] OCGA § 51-16-1 (5); 31-6-2 (17).

[22] (Emphasis supplied.) OCGA § 51-16-2 (a).

15

obligation to adopt a party's legal conclusions based on [the] facts."[23] As noted above, the complaint alleges that AMS:

> [A]fter restrictions [on outside visitation] were purportedly established, Arbor Terrace failed to exercise even slight diligence to enforce them as individuals from outside the facility were still permitted to visit individual[s] inside the facility and no commonsense safety precautions were implemented such as limiting visitation to an isolated area in the facility. . . .

> Arbor Terrace failed to exercise even slight diligence to prevent the spread of the coronavirus by allowing staff members to work at the facility without wearing masks or other protective equipment . . . as late as March 25, 2020. . . .

> Arbor Terrace failed to exercise even slight diligence to prevent the spread of the coronavirus by allowing asymptomatic staff who had been exposed to COVID-19 to continue to work at Arbor Terrace. . . .

> Arbor Terrace did not even implement a policy of social distancing among residents and in the common areas until on or after March 17, 2020.

---

[23] (Punctuation omitted.) *City of Sandy Springs v. City of Atlanta*, 358 Ga. App. 604, 605 (855 SE2d 779) (2021). See also *Best Jewelry Mfg. Co. v. Reed Elsevier Inc.*, 334 Ga. App. 826, 835 (2) (780 SE2d 689) (2015) (allegation that an e-filing fee was "unreasonable" and denied access to courts was a legal conclusion insufficient to save the complaint from dismissal).

16

On or about March 17, 2020, when any person of common sense would have recognized the catastrophic consequences of the spread of COVID-19 within an assisted living community, Arbor Terrace hosted a St. Patrick's Day social among residents in its common areas. . . .

On or about March 17, 2020, when any person of common sense would have recognized the catastrophic consequences of the spread of COVID-19 within an assisted living community, Catherine Hendrix was taken on a scenic ride organized by Arbor Terrace with several other residents of Arbor Terrace, a driver . . and a [s]taff [p]assenger. . . .

These allegations show that the wrongful conduct alleged by the plaintiffs focuses on the decisions made by AMS during the onset of the pandemic and ending on March 26, 2020, at the latest. The decisions addressed whether and how to allow visitation, socialization, and recreation at the residential facility, and the relevant time frame was within the ten days following the declaration of a public health emergency by the governor. In particular, the complaint challenges the decision to hold a St. Patrick's Day gathering and social outing on March 17, merely four days after the emergency declaration. The complaint alleges that Hendrix experienced symptoms of infection by March 26th, so any relevant misconduct on the part of AMS would have occurred before that date.

It is undisputed that the early days of the pandemic were marked by uncertainty and incomplete scientific understanding of the novel virus and its behavior, and any mitigation strategies were unsettled and unfamiliar. According to the allegations of the complaint, AMS's response was belated and fell short, but it did respond. The complaint alleges that AMS had a policy limiting visitation, but it failed to adequately enforce it. Likewise, AMS implemented social distancing "on or after March 17," and AMS eventually did require employee masking by March 25. Further, the social events on March 17 — merely three days after the governor had declared a public health emergency — were limited to an in-house social gathering and a supervised "scenic drive." These are not the sort of events, such as inviting the public to a large indoor concert, that might demonstrate the total absence of even a slight amount of common sense that typifies gross negligence.[24] AMS's conduct in following through with ordinary social activities demonstrates a belatedness or lack of urgency in its response, but it does not demonstrate a total disregard for the welfare of the residents.

---

[24] See OCGA § 51-1-4 ("In general, slight diligence is that degree of care which every man of common sense, however inattentive he may be, exercises under the same or similar circumstances. . . . The absence of such care is termed gross negligence.").

Put another way, merely acting in a way that no prudent person would is negligence, but absent a greater deviation from ordinary care beyond that "which even careless" people observe, the conduct does not meet the gross negligence standard.[25] The complaint does not allege that AMS was oblivious to risk, resistant to action, or undertook activities that *increased* the risk of exposure in a way that was not already a part of routine life at the facility. Thus, the facts alleged in the complaint demonstrate either an under-response or a temporary continuation of normal activity — all occurring at the time of uncertainty during the first days of the pandemic in Georgia. This does not meet the plaintiffs' burden to allege gross negligence.[26]

In sum, the amended complaint does not set out a factual basis for a claim of gross negligence or willful misconduct sufficient to overcome the immunity provided

---

[25] (Punctuation omitted.) *Colonial Properties Realty Partnership v. Lowder Constr. Co.*, 256 Ga. App. 106, 112 (5) (567 SE2d 389) (2002).

[26] With respect to willful or wanton conduct, "[w]ilful conduct is based on an actual intention to do harm or inflict injury; wanton conduct is that which is so reckless or so charged with indifference to the consequences [as to be the equivalent in spirit to actual intent." (Punctuation omitted.) *Chrysler Corp. v. Batten*, 264 Ga. 723, 726 (3) (450 SE2d 208) (1994). None of the facts alleged demonstrate an intent by AMS to harm its residents.

for in the GCPBSA.[27] Accordingly, the trial court erred by denying AMS's motion to dismiss.

*Judgment reversed. Reese, J., and Senior Appellate Judge Herbert E. Phipps concur*.

---

[27] Cf. *Dept. of Human Res. v. Mitchell*, 238 Ga. App. 477, 480 (2) (518 SE2d 440) (1999) (physical precedent only) (trial court erred by denying a motion for a directed verdict because defendant was entitled to statutory immunity for ordinary negligence, and the facts proved did not demonstrate gross negligence).